413 So.2d 1026 (1982)
Fred C. VINSON
v.
M.L. (Mac) McCARTY.
No. 53178.
Supreme Court of Mississippi.
May 19, 1982.
Carter & Davidson, Dudley H. Carter, Columbus, for appellant.
Gholson, Hicks & Nichols, Aubrey E. Nichols, Columbus, for appellee.
Before WALKER, BOWLING and HAWKINS, JJ.
HAWKINS, Justice, for the Court:
Fred C. Vinson has appealed from a final decree of the Chancery Court of Lowndes County which dismissed his bill of complaint filed against M.L. (Mac) McCarty for payment of unpaid interest on a promissory note executed by McCarty to Vinson, and attorney fees.
The only issue we address on this appeal is whether payment by McCarty of the remaining balance due on a note from Vinson to the Merchants & Farmers Bank of Starkville extinguished or discharged the McCarty promissory note which had been assigned to the bank as collateral security for the Vinson note. We hold that it did not and reverse.
In 1977, Vinson, a resident of Oktibbeha County and an employee of Mississippi State University, enrolled in a real estate course being taught by McCarty, a Lowndes County resident and a licensed realtor, at *1027 the Golden Triangle Vo-Tech Center. During class, McCarty commented he could retire in five years by investing $30,000 in real estate. Intrigued, Vinson questioned McCarty following class, and was informed by McCarty that he had some property in mind if Vinson would put up the equity capital.
According to Vinson the agreement was that he would be repaid his investment plus interest, after which the two would divide the profits. McCarty testified they also agreed to split the losses, if any were sustained.
On October 10, 1977, Vinson invested $7,000 in a house and lot on Springdale Drive in Columbus. This property was sold January 23, 1978, which, after paying all costs (including a realtor's commission to McCarty and interest at 9 1/2% to Vinson), resulted in a net profit of $2,441.20 to their joint venture. McCarty duly paid Vinson his share of the profit in this transaction.
On October 19, 1977, McCarty executed a promissory note to Vinson in the principal sum of $11,500 at 9 1/2% interest, due four (4) months from date. The note provided for attorney fees in the event of default. To obtain the $11,500 it was necessary for Vinson to borrow it from the Merchants & Farmers Bank, which made a loan of $11,500 to Vinson on October 20, 1977, evidenced by Vinson's promissory note to the bank in this amount due February 20, 1978, and bearing interest initially at 9 1/2%. To secure his note, Vinson assigned and delivered the McCarty note to the bank as collateral.[1]
Vinson wrote a check to McCarty or his realty firm for $11,500. McCarty then purchased a house and a lot in the Eastwood Hills subdivision in Lowndes County using the $11,500 to pay part or all of the equity of the sellers, and assumed a first deed of trust due First Federal Savings & Loan Association of Columbus against the property.
McCarty had not sold the property by February 20, 1978, and it was necessary for Vinson to extend his note to the bank. The bank extended the due date of the note to August 14, 1978, and increased the interest to 10%. The sagacious bank loan officer then advised Vinson to get some security for his note from McCarty. At Vinson's request, McCarty executed a second deed of trust in favor of Vinson on the house and lot on February 16, 1978, and on March 28, 1978, Vinson assigned the deed of trust to the bank.
McCarty had not sold the property by August 14, 1978, and the bank extended the due date to October 14, 1978. On August 25, 1978, McCarty sent a memo to the bank attaching a copy of the sales contract of the property and notifying the bank the prospective purchaser had made application for a loan at First Federal Savings & Loan Association, which was then being processed. The memo stated: "Mr. Fred Vinson is holding a second mortgage on property."
No sale had been consummated by October 14, 1978, and the bank again extended the due date of the Vinson note to December 14, 1978.
On November 8, 1978, Mr. James E. Brown, Vinson's attorney, wrote McCarty requesting payment on the note. McCarty returned Brown's letter to him by mail with the following written notation on the bottom:
1. Thanks to you for your letter of consideration. My original intent was that Fred would only hold note for security in case of death. The money would not be due until the "Partnership" house was sold. (Just like we have done previously.)
2. I am making arrangements on this & will advise you shortly.
Thanks, Mac
On November 17, 1978, McCarty again sent a "speed message" handwritten memorandum to Mr. Brown stating the following:

*1028 Subject: Fred C. Vinson
Ed, I am making arrangements through the bank to go ahead and secure a loan to pay off the note.
I will keep you posted. I don't need any additional expense on this transaction.
Thanks, Mac
The same day, McCarty sent a handwritten memorandum to Mr. Jim Cook of the bank stating:
Mr. Cook,
Re: Vinson Loan
I'm sorry for any inconvenience on this note. I would appreciate your bearing with us a few more days.
I am making arrangements to pay you the note.
Thanks,
M.L. McCarty
On November 28, 1978 and again on December 6, 1978, McCarty wrote Mr. Brown stating that the loan was in progress and the application should be "finalized soon."
The bank was not paid by December 14, 1978, and extended the due date to January 22, 1979.
McCarty learned that the bank had been assigned the second deed of trust from him to Vinson, and sometime in the latter part of December, or first part of January, 1979, requested of the bank the current debt, including interest, due the bank.[2] He then paid the bank all outstanding balance due it, and the bank cancelled and satisfied the deed of trust of public record in the chancery clerk's office in Lowndes County. The deed of trust was cancelled of public record on January 12, 1979. Upon payment by McCarty of the current balance, the bank reassigned the McCarty note to Vinson.
The sale of the property did not result in a profit, however, but a loss, contended by McCarty to be in the amount of $7,709.44.
On October 1, 1980, Vinson filed a bill of complaint against McCarty in the chancery court of Lowndes County charging that McCarty had paid the principal sum due on the note but no interest, and that McCarty owed $1,334.38 in interest. He also prayed for a decree for all interest due him under the note plus reasonable attorney's fees as provided in the note.
McCarty filed an answer denying any indebtedness was owed to Vinson, and asserted affirmatively that Vinson had no interest or standing to sue, having previously assigned his note to the bank, and that the indebtedness had been discharged when the bank satisfied the deed of trust of public record.
McCarty also filed a cross-bill with his answer, alleging that the parties had engaged in a joint venture resulting in a loss of $7,709.44, and sought contribution from Vinson. The cross-bill alleges each party's share in the loss was $3,854.72, and that crediting Vinson's share of the loss with $1,301.49, the interest due on his note to the date of the sale, there remained due McCarty from Vinson the sum of $2,553.23. The cross-bill prayed for a monetary judgment from Vinson in this amount.
At the hearing before the chancellor, when the complainant Vinson had rested, McCarty made a motion to dismiss the bill of complaint which was sustained. The chancellor made the following statement:
Gentlemen, the motion will be sustained. When the assignment was given to M & F Bank, for whatever purpose, it became the property of M & F Bank; and when that note held by M & F Bank was satisfied, then the debt was extinguished as evidenced by the note.
The chancellor then heard the cross-bill, at which time McCarty and his bookkeeper testified. Following their testimony the court rendered an opinion that the parties *1029 had been engaged in a joint venture, but that there had been insufficient proof for him to make an adjudication.
On January 29, 1981, the court rendered a final decree dismissing the bill of complaint for the reason Vinson "has no interest in the subject matter of the suit which was filed by him." The chancellor further found the cross-complainant McCarty was not entitled to any relief, "for the reasons set forth in the court's opinion," and likewise dismissed the cross-bill.
Vinson appealed; McCarty filed no cross-appeal.
At the threshold, we do not believe the chancellor was manifestly wrong in holding the parties were engaged in a joint venture. We do not have before us, however, any cross-appeal resulting from the chancellor's denial of relief under the cross-bill.
The only question before us is whether the chancellor erred in holding that McCarty extinguished the debt or note due Vinson by paying the bank the outstanding balance due it. In this holding the chancellor was mistaken.
There are three evidences of debt in this case:
(1) McCarty's promissory note to Vinson dated October 19, 1977, for $11,500 at 9 1/2% interest, and due four months from date;
(2) Vinson's promissory note to the Merchants & Farmers Bank dated October 20, 1977, for $11,500 at 9 1/2% interest, and due February 20, 1978; and
(3) Second deed of trust from McCarty in favor of Vinson on Eastwood Hills lot dated February 16, 1978, to secure McCarty promissory note to Vinson.
When Vinson secured his loan from the bank he assigned McCarty's note to him to the bank. It was not a simple endorsement of a negotiable instrument, but an assignment on the reverse side in the following language:
I, Fred C. Vinson, for value received do hereby assign any and all interests in promissory note dated October 19, 1977 to Merchants & Farmers Bank, Starkville, Mississippi.
(signed) Fred C. Vinson
When the bank was paid, it also on the reverse side of this same note assigned its interest to Vinson in the following language:
Merchants & Farmers Bank for value received hereby assigns any and all interest in promissory note dated October 19, 1977 to Fred C. Vinson.
Merchants & Farmers Bank
By: J.D. Cook, Jr.
That the assignment of the McCarty note to the bank was collateral security for Vinson's note should be beyond dispute. The bank's note refers to a note as collateral security. Mr. Cook, lending officer of the bank, testified that it was collateral. All interest payments made by Vinson and the final payment by McCarty were credited to the Vinson note. McCarty testified that at the time Vinson asked him to execute a second deed of trust on the property in favor of Vinson, the reason Vinson gave him for making this request was: "That his  the note was due that he had borrowed from the bank, and he needed to give them some collateral." It would be difficult to even argue under the facts of this case that the bank could have held this note under any other circumstances than as collateral security.[3]
The rights of these parties are determined by the Uniform Commercial Code.
Mississippi Code Annotated Section 75-3-201 provides:
(1) Transfer of an instrument vests in the transferee such rights as the transferor has therein... .
(2) A transfer of a security interest in an instrument vests the foregoing rights in the transferee to the extent of the interest transferred.
Section 75-9-207(1) provides:

*1030 A secured party must use reasonable care in the custody and preservation of collateral in his possession. In the case of an instrument or chattel paper reasonable care includes taking necessary steps to preserve rights against prior parties unless otherwise agreed.
The Official Code Comment of the Uniform Commercial Code Section 3-201, Comment 5, reprinted in 2 Anderson, Uniform Commercial Code Section 3-201:1 (2d ed. 1971), states the following:
5. Subsection (2) restates original Section 27 and is intended to make it clear that a transfer of a limited interest in the instrument passes the rights of the transferor to the extent of the interest given. Thus a transferee for security acquires all such rights subject of course to the provisions of Article 9 (Secured Transactions).
And, further, the Official Code Comment of the Uniform Commercial Code Section 9-207, Comment 1, reprinted in 4 Anderson, Uniform Commercial Code Section 9-207:1 (2d ed. 1971), states:
1. Subsection (1) states the duty to preserve collateral imposed on a pledgee at common law. See Restatement of Security, §§ 17, 18... .
This same authority states Section 9-207 reiterates the general rule that a pledgee must take steps to preserve the collateral, including, in the case of commercial paper, the taking of steps necessary to enforce claims against primary parties. Anderson, supra, at Sections 9-207:3 and 9-207:4.
Sections 17 and 18 of the Restatement of the Law of Security state:
§ 17. PLEDGEE'S DUTY OF REASONABLE CARE.
The pledgee owes to the pledgor the duty of reasonable care of the pledged chattel except where the chattel is in the possession of a third person designated by the pledgor or is in the possession of the pledgor himself.
§ 18. PLEDGEE'S DUTY TO COLLECT INSTRUMENTS.
Where instruments representing claims of the pledgor against third persons are pledged, the pledgee has the duty of using reasonable diligence to preserve and collect the claims or to enable the pledgor to undertake such preservation and collection.
Restatement of Security §§ 17 and 18 (1941).
Section 9-207 of the Uniform Commercial Code preserves a well-established common law duty of a pledgee. Annot., 68 A.L.R.3d 657, 659-50 (1976), dealing with the duty of a pledgee under this section states:
§ 2. Background, summary, and comment
[a] Generally
In accordance with the general rule that in the absence of any agreement to the contrary, the holder of collateral security is bound to exercise ordinary diligence to preserve the validity and pecuniary value thereof, the view was strongly represented at common law, and approved by the Restatement of Security, that a pledgee who received instruments representing claims of the pledgor against third persons was under a duty to use reasonable diligence to preserve and collect the claims or to enable the pledgor to do so.
The Uniform Commercial Code purports to preserve the common-law rule as represented in the Restatement. It provides at § 9-207(1) that a secured party must use reasonable care in the custody and preservation of collateral in his possession, and that, in the case of an instrument or chattel paper, reasonable care includes taking necessary steps to preserve rights against prior parties unless otherwise agreed.
The cases of Dubman v. North Shore Bank, 85 Wis.2d 819, 822-23, 271 N.W.2d 148, 150 (1978) and Borden v. District of Columbia, 417 A.2d 402, 404, n. 6 (D.C.App. 1980) hold U.C.C. Section 9-207 is essentially a restatement of the common law governing pledges.
This Court has long recognized this common law duty. Koelling v. Bank of Greenwood, 236 So.2d 371 (Miss. 1970); Boswell v. Thigpen, 75 Miss. 308, 22 So. 823 (1897).
*1031 McCarty argues on his appeal that when he or his firm called the bank and asked for the payoff amount due on the note, following which he paid the bank, that this satisfied and discharged his note to Vinson. Such contention is untenable. In the first place, the endorsement or assignment was not unconditional, but rather a collateral security in the nature of a pledge. Secondly, there is no evidence that the bank ever represented to McCarty or in any way intended to or purported to satisfy the McCarty note to Vinson. Furthermore, there is no proof or contention by McCarty when the bank was paid that he thought he was paying the entire amount which he owed to Vinson. McCarty had made no payments to Vinson, and therefore, insofar as he was concerned, he knew $11,500 plus interest at the rate of 9 1/2% per annum from October 19, 1977 was owed by him under his note. There is nothing to indicate from this record that McCarty, in making a "payoff," thought or understood that he was paying the entire amount due and owing under his note to Vinson. Indeed, while the second deed of trust was satisfied of public record, neither McCarty's note to Vinson, or even the bank's note was marked "paid," or was delivered to McCarty. Finally, the bank would have had no authority to satisfy the McCarty note upon payment to it of the balance due on the Vinson note to the bank. There was no merger of the two notes. The bank having no such authority, it would be anomalous indeed to hold McCarty, charged with knowledge of the facts of the loan from the bank to Vinson, or at least sufficient facts to put him on inquiry, could discharge his note to Vinson by paying the bank less money than he owed Vinson under his note.[4]
In the case of Eckert v. Searcy, et al., 114 Miss. 150, 74 So. 818 (1917), Mrs. Eckert held some promissory notes executed to her by Lewis. Mrs. Eckert endorsed and delivered to Searcy three of the notes in the principal amount of $100 each as collateral security for a $98.70 debt Mrs. Eckert owed Searcy. Thereafter, Searcy sold the notes back to Lewis for $125.00 and marked each of them paid. Mrs. Eckert sued both Searcy and Lewis. This Court stated:
... If the transaction was a pledge of the notes as collateral security, then there can be no question as to the liability of the appellee Searcy to account to Mrs. Eckert for their wrongful disposition. Second, if the transaction was a pledge, as security, and Lewis, appellee, the maker of the notes had notice of, or was put upon inquiry, as to the fact that his notes were being held as a pledge of collateral security by Searcy, and he knew, or should have known, that Searcy had no right to dispose of the notes at such a great sacrifice and in such manner and without notice, and knowing this when he purchased, or pretended to purchase, the notes from Searcy for one hundred and twenty-five dollars, his own notes, which were worth three hundred dollars and thus participating in the wrong, did Lewis become a trustee "in invitum" and accountable to the appellant, Mrs. Eckert, for the amount called for by the three notes of one hundred dollars each executed by him, less the debt due by the appellant, Mrs. Eckert, to the appellee R.J. Searcy, which was ninety-eight dollars and seventy cents?
* * * * * *
A court of equity will grant relief to the pledgor, whose securities he has pledged as collateral and which have been wrongfully sacrificed or compromised with the maker to his injury and damage. Equity will not enforce a forfeiture, but will relieve against it. Pomeroy's Eq. Jur. (3d Ed.) vol. 1, section 433.
* * * * * *

*1032 ... the act of a creditor holding amply secured notes of his debtor as collateral, in accepting a less sum than the amount due thereon from a solvent maker in full satisfaction thereof, does not preclude the latter from recovering the balance due from the maker.
Id. at 159-61, 74 So. at 819-20. This Court concluded, after holding both Lewis and Searcy liable:
... The appellee Searcy is entitled to satisfaction of his indebtedness of ninety-eight dollars and seventy cents; the appellant, Mrs. Eckert, is entitled to the amount represented by the three one hundred dollar notes, less the ninety-eight dollars and seventy cents due to Sarcy [sic]; and appellees should pay to the appellant, Mrs. Eckert, the amount of the three notes, less the ninety-eight dollars and seventy cents due to Searcy... .
Id. at 164, 74 So.2d at 820.
In the case of Love v. Rogers, 168 Miss. 1, 150 So. 815 (1933), Rogers executed two notes to the Bank of Shelby, which pledged the notes to a Memphis Bank as collateral security. Thereafter, Rogers, upon learning the Memphis bank had the notes and under circumstances as to put him on notice that they were held by the Memphis bank as collateral security, went to Memphis and paid the Memphis bank less than was due under the notes. The two notes were marked "paid" and delivered to Rogers. In holding the action of the Memphis bank did not satisfy the notes, this Court stated:
... A pledgee of commercial paper is a trustee for the pledgor, and, unless expressly authorized so to do, cannot discount that paper at less than its face value, or transfer it for a compromise amount to any person with notice or the equivalent thereof; and the burden of proof to show the authority of the pledgee rests upon him who asserts the validity of the pledgee's action in so disposing of the paper at less than its face value. Eckert v. Searcy, 114 Miss. 150, 74 So. 818.
Id. at 7, 150 So. at 815.
This Court then concluded that since there was no proof offered the Memphis bank held such authority, the notes were not discharged.
When Vinson assigned the McCarty note to the bank as collateral security, reciprocal obligations arose. Vinson had no right to compromise or settle the note from McCarty, or take any action to diminish the bank's interest therein to the full extent of Vinson's indebtedness to the bank, and the bank's title thereto to the extent of such debt due it by Vinson was paramount. See International Harvester Co. v. People's Bank & Trust Co., 402 So.2d 856 (Miss. 1981). On the other hand, the bank's sole interest in the McCarty note was as security for the debt owed it by Vinson. Upon being paid, the bank returned the McCarty note to Vinson as it was obligated to do. The note remained valid and outstanding, with McCarty being entitled to credit thereon for all money he paid the bank in this transaction.
Since the McCarty note provides for a reasonable sum as attorney's fee, this case is remanded for a determination by the chancellor of the current balance due thereon, and upon proof, of a reasonable attorney's fee, and decree accordingly in favor of Vinson.
Reversed and remanded for hearing consistent with this opinion.
REVERSED AND REMANDED.
PATTERSON, C.J., SUGG and WALKER, P. JJ., and BROOM, ROY NOBLE LEE, BOWLING, DAN M. LEE and DARDEN, JJ., concur.
NOTES
[1] The face of the Vinson note to the bank shows it to be secured and following the word "collateral" are typed the following words: "Assignment of note and additional on other notes outstanding."
[2] On the reverse side of the promissory note from Vinson to the bank, under the heading "Payments on Interest," "Date Paid," and "Interest Paid," are the following credits on the note:

2/16/78  $358.10
5/28/78  $665.56
11/9/78  $128.70
12/22/78  $135.33

This constituted a total payment of $1,287.69 in interest on the bank's note.
[3] Dollar v. Land, 184 F.2d 245 (D.C. Cir.1950) cert. denied 340 U.S. 884, 71 S.Ct. 198, 95 L.Ed. 641; 68 Am.Jur.2d Secured Transactions § 50 at 878 (1973).
[4] While McCarty testified he learned in December, 1978, his deed of trust to Vinson had been assigned to the bank, the record is silent as to what McCarty thought or understood relative to his personal note to Vinson. If he thought his note to Vinson had not been assigned to the bank, then he obviously knew when he paid the bank he was not paying his note to Vinson. On the other hand, if he understood his note to Vinson had been assigned to the bank, it was as collateral security.